**Eula Faye KING, Eddie Dwayne King, and Nancy Marie King, as the heirs at law of Franklin J. King, Jr., Deceased, Appellants,**

**v.**

**Robert AHRENS, M.D., Individually and d/b/a The Ahrens Clinic, and Richard Ahrens, M.D., Individually and d/b/a The Ahrens Clinic, A Partnership, Appellees.**

**No. 92–2997.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 17, 1993.

Decided Feb. 9, 1994.

Rehearing Denied March 10, 1994.

---

Counsel who presented argument on behalf of the appellant was Charles Phillip Boyd, Jr. of Little Rock, Arkansas.

Counsel who presented argument on behalf of the appellee was Walter B. Cox of Fayetteville, Arkansas. Constance G. Clark of Fayetteville, Arkansas, appeared on the brief.

Before MAGILL and HANSEN, Circuit Judges, and HAMILTON,* District Judge.

HANSEN, Circuit Judge.

Eula Faye King and her children (the Kings) brought this diversity malpractice action after Franklin J. King, Jr., their husband and father died of a heart attack. The district court[1] entered judgment upon a jury verdict in favor of the defendant doctors on the malpractice claim and a directed verdict dismissing the Kings' claimed cause of action under 42 U.S.C. section 1395dd. For reversal, the Kings argue that the district court erred by excluding two categories of impeachment evidence they offered at trial and by dismissing their cause of action under section 1395dd, 798 F.Supp. 1371. We affirm.

## I.

On April 27, 1989, Eula Faye King brought her husband, Franklin J. King, Jr., to the Ahrens Clinic, fearing he might be having a heart attack. Dr. Robert Ahrens examined Mr. King, who was complaining of a "dull, gripping" chest pain radiating into his arms and neck. (Appellants' App. at 20.) During the examination, Dr. Ahrens ordered two EKGs, administered some medication to Mr.

---

* The HONORABLE JEAN C. HAMILTON, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable H. Franklin Waters, Chief United States District Judge for the Western District of Arkansas.

King, including nitroglycerin and a narcotic pain medication, and obtained some medical history from Mr. and Mrs. King. Throughout the morning, Mr. King remained at the clinic where he was examined, observed, and given various tests.

In Dr. Ahrens' opinion, Mr. King's pain was an esophogeal spasm secondary to his hiatal hernia and reflux esophogitis, although he could not rule out the possibility of a heart attack. Dr. Ahrens instructed Mr. King to return the following Monday to undergo a treadmill test, and Mrs. King understood that she was to bring him back anytime if his condition got worse again before Monday. Dr. Ahrens prescribed percodan, a narcotic pain medication, for Mr. King and according to the medical chart he allowed Mr. King to go "home—to bed." (*Id.* at 20–21.) Mr. and Mrs. King went home where Mr. King died two days later of a myocardial rupture secondary to a heart attack.

Mrs. King and her children sued Dr. Robert Ahrens and Dr. Richard Ahrens, partners in the Ahrens Clinic, in a two-count complaint. In count I, they alleged that Dr. Robert Ahrens was negligent in failing to properly diagnose Mr. King's condition and that this negligence resulted in Mr. King's untimely death. In count II, they claimed that the doctors violated 42 U.S.C. section 1395dd, the Emergency Medical Treatment and Active Labor Act (Act), also known as the "patient-dumping" Act, by failing to recognize Mr. King's emergency condition and by releasing Mr. King before his condition had stabilized.

At trial, there was some expert testimony to the effect that Mr. King might not have died had he been hospitalized at the time of his examination by Dr. Robert Ahrens. (*See* Trial Tr., Vol. II at 33–34.) The testimony of Dr. Ahrens and Mrs. King was at variance concerning what advice Dr. Ahrens offered with regard to hospitalization. Dr. Ahrens testified that he informed the Kings that he did not think the episode was a heart attack but that he could not rule out the possibility that the pain was of cardiac origin. He testified that he gave the Kings three options: they could stay at the clinic awhile longer, go to a hospital, or go home. Dr.

Ahrens stated that he advised the Kings that he preferred to send Mr. King to the hospital; however, he also testified that he did not feel hospitalization was completely necessary. He testified that Mr. King refused hospitalization because of the prohibitive cost and that he therefore allowed Mr. King to go home, knowing he could not force hospitalization upon him.

To the contrary, Mrs. King testified that during the examination Dr. Ahrens said that he was 100 percent certain that the pain was not a heart attack. She admitted that Dr. Ahrens gave them three options, one of which was going to a hospital. Nevertheless, she maintained that Dr. Ahrens did not tell them that hospitalization was necessary but rather that it was safe for Mr. King to go home. Mrs. King insisted that their decision to go home instead of to the hospital was based upon Dr. Ahrens' assurance that the symptoms were not of cardiac origin. Further, Mrs. King testified that she and her husband would have opted for and would have been able to pay for hospitalization had Dr. Ahrens advised them that it was necessary.

At trial, the Kings attempted to impeach Dr. Ahrens' credibility. They pointed out that Dr. Ahrens' trial testimony was inconsistent with what he recorded in the medical chart and also with his prior deposition testimony. For instance, at trial Dr. Ahrens testified that he never prescribed percodan for Mr. King. The Kings then confronted him with a written prescription which forced Dr. Ahrens to admit that he had in fact written a percodan prescription for Mr. King on April 27, 1989. The Kings also demonstrated that Dr. Ahrens failed to record the prescription on Mr. King's medical chart. Then the Kings confronted Dr. Ahrens with his own deposition testimony wherein he stated that prescribing percodan would be inappropriate in a situation like Mr. King's. They further noted that although Dr. Ahrens testified that he recommended hospitalization and Mr. King refused it due to the cost, the medical chart is devoid of any indication that Mr. King refused hospitalization or went home against Dr. Ahrens' medical advice.

Dr. Ahrens attributed these omissions and inconsistencies to oversight on his part.

At the close of the Kings' evidence, the district court granted a directed verdict dismissing the Kings' claim under 42 U.S.C. section 1395dd. Following trial, the jury returned a verdict in favor of the doctors on the medical malpractice claim. The Kings appeal.

## II.

The Kings appeal two evidentiary rulings of the district court which they contend limited their ability to impeach Dr. Ahrens' credibility. First, the Kings unsuccessfully sought to admit evidence that Dr. Ahrens' medical license had been suspended for a period of 30 days approximately eight years earlier. Second, the Kings were unsuccessful in seeking to admit evidence that Dr. Ahrens had once been a member of the American Society for Clinical Hypnosis and had used hypnosis in his practice.

■ The district court has broad discretion in determining whether to admit or exclude evidence at trial. *Cummings v. Malone*, 995 F.2d 817, 823 (8th Cir.1993). We will reverse a district court's evidentiary decision "only for a 'clear and prejudicial' abuse of that discretion." *Id.* (citations omitted). Abuse of discretion occurs "[w]here the district court excludes evidence of a critical nature, so that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted." *Adams v. Fuqua Indus., Inc.*, 820 F.2d 271, 273 (8th Cir.1987).

Credibility was a key issue in this case because Dr. Ahrens and Mrs. King gave differing accounts of what advice and diagnosis Dr. Ahrens provided during his examination of Mr. King. The Kings attacked Dr. Ahrens' credibility from the very beginning of the trial by pointing out inaccuracies in his medical chart and demonstrating flaws in his memory. Dr. Ahrens attempted to explain

away these inconsistencies by attributing them to mere oversight on his part.

The Kings then sought to introduce evidence of Dr. Ahrens' past medical license suspension for overprescribing percodan. They wanted to show that Dr. Ahrens did not innocently overlook the omission of percodan from the medical chart but rather that he intentionally tried to hide the prescription of percodan because of his past license suspension for overprescribing the drug. The district court ruled that the license suspension was collateral to any relevant issue in the case and found that the license suspension was "far more prejudicial than probative." (Trial Tr., Vol. I at 5, Vol. V at 4.) On appeal, the Kings contend that the district court abused its discretion in excluding the license suspension, arguing that it was admissible under Federal Rules of Evidence 403, 404(b), and 608(b).

■ Under Rule 404(b),[2] evidence of prior bad acts, though not admissible to show that a person acted in conformity with the prior act, is admissible if probative of some other purpose such as absence of mistake or accident. Fed.R.Evid. 404(b). Evidence is admissible under Rule 404(b) if it is relevant to a material issue, proved by a preponderance of the evidence, its probative value is not outweighed by its potential for prejudice, and it is similar in kind and close in time to the event at issue. *See United States v. Aranda*, 963 F.2d 211, 215 (8th Cir.1992). The trial court has broad discretion under this rule and will be reversed if it admits the evidence only if the evidence has no bearing on any issue involved and tends to prove only disposition. *United States v. DeLuna*, 763 F.2d 897, 912–13 (8th Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). In this circuit, Rule 404(b) is a rule of inclusion. *United States v. Jones*, 990 F.2d 1047, 1050 (8th Cir.1993), *cert. denied*, ― U.S. ―, 114 S.Ct. 699, 126 L.Ed.2d 666 (1994) (No. 93–5904); *United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir.1992).

2. Rule 404(b) provides in part as follows:
    Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . . .

Under Rule 608(b),[3] specific instances of prior conduct by a witness may be inquired into on cross-examination if the district court in its discretion determines that the conduct is probative of truthfulness or untruthfulness. *See United States v. Amahia*, 825 F.2d 177, 180 (8th Cir.1987). The purpose of the rule is "to avoid holding mini-trials on peripherally related or irrelevant matters." *United States v. Martz*, 964 F.2d 787, 789 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 823, 121 L.Ed.2d 694 (1992).

■ The first concern when determining admissibility under either of the above rules is relevancy. The Kings contend that the license suspension was relevant under both rules. Specifically, they argue that the prior license suspension was admissible under Rule 404(b) because it tended to show that Dr. Ahrens made no "mistake" in his failure to note critical information in the medical chart. Their theory was that Dr. Ahrens did not chart the percodan because he had been in trouble for overprescribing it before and wanted no record to show he was questionably prescribing it again. They also argue that the license suspension was admissible during cross-examination under Rule 608(b) as relevant to credibility.

Whether or not Dr. Ahrens' past license suspension was admissible as probative of an absence of mistake or of Dr. Ahrens' credibility was a close call, but to make the close calls is a trial judge's *raison détre*. The ultimate issue at trial was whether or not Dr. Ahrens provided negligent treatment by failing to properly diagnose and hospitalize Mr. King two days before his death. The past license suspension is not directly related to the ultimate issue of negligence because the percodan prescription was never indicated as a cause of Mr. King's death. Nevertheless, although the connection is somewhat tenuous, the past license suspension might tend to show that Dr. Ahrens would have a reason to be selective in the information he chooses to record about a given case, and making an intentional omission bears on a person's character for truthfulness. Therefore, we cannot say that the license suspension has no bearing on the issues of absence of mistake or Dr. Ahrens' credibility. The evidence arguably meets the particular relevancy requirements of both Rule 404(b) and Rule 608(b).

The analysis does not end with a determination of relevancy, however. The Rule 403 balancing of probative value versus prejudicial effect is an integral step toward a determination of admissibility under either Rule 404(b) or Rule 608(b). Under Rule 403,[4] the district court "can and should exclude otherwise relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice ...'" *Cummings*, 995 F.2d at 823 (quoting Fed.R.Evid. 403). Evidence is unfairly prejudicial for purposes of Rule 403 "when it would influence the jury to decide the case on an improper basis." *Id.* at 824. In balancing the probative value and prejudicial effect, "great deference is given to the district judge's determination, and express findings are not required." *DeLuna*, 763 F.2d at 912 (citation omitted).

The danger of unfair prejudice is substantial and immediately apparent in this case for several reasons. The license suspension by its very nature reflects badly on Dr. Ahrens' professional conduct, although this alone does not amount to *unfair* prejudice. Additional factors to weigh include the remoteness of the license suspension to the incident at issue, the suspension having occurred approximately eight years before Dr. Ahrens' examination of Mr. King. The license sus-

---

3. Rule 608(b) provides in pertinent part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

4. Rule 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

pension did not arise out of the same or similar circumstances as the incident at issue. Further, the veracity of Dr. Ahrens and his medical chart were subject to thorough impeachment at trial by inconsistencies readily apparent in his testimony, the medical chart, and his deposition, and the past license suspension would have shed little new light on Dr. Ahrens' character for truthfulness. Thus, in spite of the peripheral relevance of the suspension, there was great danger that the jury might improperly infer from the fact of a distant and unrelated past license suspension that Dr. Ahrens' professional judgment and conduct in the instant case must have been substandard solely because his license had been suspended on a prior occasion. Given the danger that this evidence might influence a jury to decide the case on an improper basis and the great deference with which we review this evidentiary ruling, we cannot say that the district court abused its discretion in determining that the danger of prejudice outweighed the probative value of the license suspension.

■ The Kings also sought to admit evidence that Dr. Ahrens had once been a member of the American Society for Clinical Hypnosis and had used hypnosis and other mental powers of persuasion in his practice. The Kings contend that this was relevant to credibility and that the district court erred in prohibiting them from cross-examining Dr. Ahrens on this subject. We find that Dr. Ahrens' past membership in the American Society for Clinical Hypnosis and Dr. Ahrens' past use of hypnosis in his practice is totally lacking in probative value in this case. Accordingly, the district court did not abuse its discretion in refusing to allow inquiry into the hypnosis issue.

### III.

■ The district court granted a directed verdict against the Kings on their claim under 42 U.S.C. section 1395dd, finding that the statute applies only to physicians connected with an emergency room or other portion of a hospital and not to physicians in a private clinic. (*See* Trial Tr., Vol. II at 84–85.) The Kings contend that the statute should be interpreted broadly to provide a cause of action against a private clinic physician. We disagree.

Whether 42 U.S.C. section 1395dd provides a cause of action against a physician working in a private clinic is an issue of first impression in this circuit. "The question of the existence of a statutory cause of action is, of course, one of statutory construction." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). We review questions of statutory interpretation de novo. *Crane v. Sullivan,* 993 F.2d 1335, 1336 (8th Cir.1993). "[A]s with any case involving the interpretation of a statute, our analysis must begin with the language of the statute itself." *Touche Ross,* 442 U.S. at 568, 99 S.Ct. at 2485.

Section 1395dd is an emergency act, "which imposes on Medicare-provider hospitals a duty to afford medical screening and stabilizing treatment to any patient who seeks care in a hospital emergency room." *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039–40 (D.C.Cir.1991). The medical screening requirement provides in part as follows:

> In the case of a **hospital** that has a **hospital emergency department,** if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the **hospital** must provide for an appropriate medical screening examination within the capability of the **hospital's emergency department,** ... to determine whether or not an emergency medical condition ... exists.

42 U.S.C. § 1395dd(a) (emphasis added). Subsection (b) mandates that a hospital provide necessary stabilizing treatment for any individual who "comes to a **hospital** and the **hospital** determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b) (emphasis added). These subsections repeatedly use the term "hospital" in defining the scope of duties created therein.

Subsection 1395dd(d)(2), defining methods of civil enforcement, creates a private cause of action for personal harm resulting from a

violation of one of these provisions. It provides as follows:

> Any individual who suffers personal harm as a direct result of a **participating hospital's** violation of a requirement of this section may, in a civil action against the **participating hospital,** obtain those damages available for personal injury under the law of the State in which the **hospital** is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). The plain language indicates that section 1395dd(d)(2)(A) creates a cause of action only against a "participating hospital." The statutory definition of "participating hospital" does not encompass an individual physician. "Participating hospital" is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C. § 1395dd(e)(2). A "'hospital' includes a rural primary care hospital (as defined in section 1395x(mm)(1) of this title)." 42 U.S.C. § 1395dd(e)(5). A rural primary care hospital is "a facility designated by the Secretary as a rural primary care hospital." 42 U.S.C. § 1395x(mm)(1). These definitions include neither an individual physician nor a private clinic, such as the Ahrens Clinic, unless designated by the Secretary as a rural primary care hospital. The Kings do not allege that the Ahrens Clinic was so designated.

Other courts that have considered this Act have found that, even though it provides civil monetary penalties against both the hospital and the physician, it provides a cause of action only against the hospital and not against an individual physician. *See Delaney v. Cade,* 986 F.2d 387, 393–94 (10th Cir.1993) (holding plain language of Act provides cause of action only against participating hospitals); *Baber v. Hospital Corp. of Am.,* 977 F.2d 872, 877–78 (4th Cir.1992) (Act provides no basis for patient to recover personal injury damages from physician); *Gatewood,* 933 F.2d at 1040 n. 1 (D.C.Cir.1991) (no private cause of action against physicians under the Act) (dicta); *Helton v. Phelps County Regional Medical Ctr.,* 817 F.Supp. 789, 790 (E.D.Mo.1993) (no cause of action for recovery of damages from physician); *Ballachino*

*v. Anders,* 811 F.Supp. 121, 123 (W.D.N.Y. 1993) (same); *Holcomb v. Monahan,* 807 F.Supp. 1526, 1531 (M.D.Ala.1992) (same); *Jones v. Wake County Hosp. Sys., Inc.,* 786 F.Supp. 538, 545 (E.D.N.C.1991) (same); *but cf. Sorrells v. Babcock,* 733 F.Supp. 1189, 1193–94 (N.D.Ill.1990) (district court has subject matter jurisdiction over private action against emergency room physician which alleges violations of 42 U.S.C. section 1395dd).

Additionally, there is no basis on which to imply a private cause of action against a physician. A cause of action may be implied in a statute if Congress intended to create a private remedy but did not expressly do so. *See Zajac v. Federal Land Bank of St. Paul,* 909 F.2d 1181, 1182 (8th Cir.1990) (citing tests announced in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). In this instance, however, Congress expressly created a private remedy which by its plain language is limited to a cause of action against the hospital. The statute itself gives no indication that Congress intended to create any remedy not expressly stated therein. The Fourth Circuit has given this issue a thorough analysis and concluded that neither the plain language nor the legislative history of the Act indicates the existence of a cause of action against a physician. *See Baber,* 977 F.2d at 877–78. The court in *Baber* states that the "legislative history makes it clear that, far from intending to allow patients to sue doctors, Congress intentionally limited patients to suits against hospitals." 977 F.2d at 877. We agree, and we adhere to the general principle that "[when] the plain language of a statute is clear in its context, it is controlling." *Blue Cross Ass'n v. Harris,* 622 F.2d 972, 977 (8th Cir.1980).

Based upon the language of the statute and guided by the reasoning of courts that have previously addressed this question, we conclude that section 1395dd does not provide a cause of action against either the Ahrens Clinic or Dr. Ahrens, the treating physician. The district court did not err by granting a directed verdict against the Kings on their cause of action under 42 U.S.C. section 1395dd.

### IV.

We find that the district court did not abuse its discretion in ruling on the admissibility of evidence and that the district court properly granted a directed verdict on the Kings' claim under 42 U.S.C. § 1395dd. Accordingly, we affirm the judgment of the district court in all respects.